## GOING et al. v. SHELTON et al.

No. 9196—Opinion Filed Dec. 10, 1918.

(176 Pac. 962.)

1. Witnesses—Court's Interrogation of Witness—Abuse of Discretion.

The interrogation of a witness by the judge during the progress of the trial is not error, and he may, in the exercise of his discretion, aid in eliciting material matter suggested by the evidence, and the exercise of this discretion does not constitute error, unless it appears from the record that the trial judge has abused his discretion in this respect to the prejudice of the complaining party.

**2. Indians — Surplus Allotment—Alienation —Statute.**

The surplus allotment of a duly enrolled member of the Choctaw Nation of one-fourth Indian blood was, prior to the congressional act of May 27, 1908. inalienable by said allottee except and upon the condition that the purchaser thereof paid said allottee the appraised value of said surplus allotment as the purchase price therefor.

(Syllabus by Davis, C.)

Error from District Court, Marshall County: Jesse M. Hatchett, Judge.

Action by Zarabelle Going and another against A. J. Shelton and another. Judgment for defendants, motion for new trial overruled, and plaintiffs bring error. Affirmed.

Geo. S. March, for plaintiffs in error.

Rider & Hurt, for defendants in error.

Opinion by DAVIS, C. This action was begun in the district court of Marshall county, Okla., by J. H. Wallace and Zarabelle Going against A. J. Shelton and G. H. Mahaney. It is an action in ejectment to obtain the possession of the S. W. ¼ of the N. W. ¼ of section 20, township 5 south, range 5 east, less 3.45 acres for right of way of the A. & C. R. R. The parties will be referred to as they appeared in the trial court.

Zarabelle Going is a one-quarter blood Choctaw Indian, enrolled opposite roll No. 15399. The land in controversy was regularly allotted to the said Zarabelle Going as part of her surplus allotment. On the 27th day of April, 1908, the said Zarabelle Going executed a deed to the above-described lands to H. S. Steward and J. H. Wallace. The consideration recited in the deed is the sum of $125. The grantees never went into possession of said land under said deed. This instrument was filed for record on the 28th day of April, 1908, and duly recorded by the register of deeds of Marshall county, Okla. On the 30th day of December, 1912, H. S Steward executed and delivered to J. H. Wallace a quitclaim deed to his undivided one-half interest in this land. This deed was recorded as provided by law.

On the 27th day of July, 1908, Zarabelle Going made, executed, and delivered a warranty deed to the land here in controversy to B. C. Biles, who went into possession thereof under and by virtue of said deed. On the 13th day of September, 1910, B. C. Biles and Mary Biles, his wife, made, executed and delivered to A. J. Shelton and G. H. Mahaney a warranty to said land, and the said Shelton and Mahaney went into posses-

sion thereof and remained in possession until the institution of this action.

Zarabelle Going was dropped out of this action as a plaintiff, and the only issues tried pertained to the respective rights of Wallace, plaintiff, and Shelton and Mahaney, defendants, in and to said tract of land.

There were two issues submitted to the jury for determination:

(1) Did Zarabelle Going, now Zarabelle Ross. execute the deed of April 27, 1908. to the land in controversy to H. S. Steward and J. H. Wallace?

(2) If you find that she executed the deed, how much did said Steward and Wallace pay her therefor?

The jury found that Zarabelle Going executed said deed to Steward and Wallace, and that she received as a consideration therefor the sum of $50. On the 11th day of January, 1917, the court found the issues of both law and of fact, outside of said special issues submitted to the jury, in favor of the defendants and against the plaintiff. The deed executed on the 27th day of April, 1908, by Zarabelle Going to Steward and Wallace to the land in controversy was canceled, and the title thereto was quieted in A. J. Shelton and G. H. Mahaney. A motion for a new trial was filed and overruled, and from the action of the court in overruling said motion an appeal is prosecuted to this court for review.

The first assignment of error presented is error of the court in asking Wallace and Steward certain questions while they were on the stand as witnesses pertaining to the transaction they had with Zarabelle Going by which they obtained the deed under which the plaintiff was asserting his right to the possession of the land in controversy. It is claimed that the court propounded certain questions to the witness during the progress of the trial, and that the manner in which the questions were propounded, the demeanor of the trial judge, tended to discredit said witnesses and cause the jury to reach the conclusion that said witnesses were lying. The witnesses claimed that they were to pay as a consideration for this tract of land the sum of $125, and when the trial judge propounded the question complained of the witnesses had testified that they paid Zarabelle Going $25 for lease in the morning on the day this deed was procured, and Steward paid her $50 in the afternoon, and they then took a note from her for the sum of $85 payable to Steward. The witness was attempting to show that this transaction consituted a payment of a consideration of $125. At

this point the conduct on the part of the trial judge that is urged here at great length as reason for a reversal of this cause occurred, which is as follows:

Examination by the Court.—"Q. I haven't got the contract price in my head yet; what did you and Seward agree to give this woman for this 40-acre tract of land? A. $125. Q. How much money did you pay her? A. We paid her on that day $75. Q. Well, $25 of that you paid her for lease? A. Yes, sir; $25 of that we paid her on the lease, and after we took the lease— Q. Lease on what? A. On this land up here. Q. On this land exclusively, or on this land and some other. A. That and other. Q. Did you release that lease? A. Yes, sir. Q. That day? A. Yes, sir; we told her we released that. Q. Did you execute a written release? A. No, sir; didn't execute a written release, nor never did put it on record. Q. Never did put what on record? A. That lease on record. Q. Your contention is you paid her $25 for the lease on this land and other land in the morning? A. Yes, sir. Q. And that afternoon you paid her $50 for this deed? A. Yes, sir. Q. What else did you give her? A. We didn't give her anything else right then. Q. Did you ever? A. Yes, sir; gave her $85. Q. When? A. As soon as she got Mr. Armstrong— Q. How long after this? A. Something like, maybe a month. Q. Did you pay her $85 in money? A. Mr. Armstrong and her together. Q. How much did you pay her? A. I didn't pay her anything myself; Mr. Steward paid it to Armstrong and her. Q. How much? A. $85. Q. In money? A. Yes, sir. Q. Then that made $160, as you claim, then? A. Yes, sir. Q. Why how come you to say you paid her $125? A. After he got her restrictions off, this other was to go on the other land, and we was to sell her some land down there. Q. What is that? A. He paid her that. Q. Who do you mean by 'he'? A. Mr. Steward. Q. All; he paid her this $85? A. Yes, sir; and all over the $125 was to go to the other land here, and he was to sell her some land down there. He was to buy all her stuff here, and sell her some down there. Q. How come him to pay her more than the contract price for this land? A. She agreed to sell him the balance of her land, and she didn't do it. Q. What was it about the note deal; you said awhile ago she gave Mr. Steward a note? A. He held a note for $85 against her that he put up for costs and expenses. Q. When was that note made? A. It was made in May, I think. Q. That same year? A. Yes, sir; 1908. Q. What did you and Steward give her to show for the rest of the purchase of this 40 acres of land? A. That note. Q. Gave her that note. A. Paid Armstrong off and gave her the note. Q. You said awhile ago she gave Steward a note. Who signed that note? A. Her and her daughter, I think. Q. To whom was it given? A. To Steward. Q. That was after this transaction? A. Yes, sir. Q. On the day of this deed what did you and Steward give her to show for the deferred payment? A. Well, we were to pay this. Q. Pay what? A. That expense money. Q. What expense money? A. To have restrictions removed. $85, that is what he paid. Q. When was the money turned over to Armstrong? A. In May. Q. When was the note given; when was the note turned over; when was the note signed? A. It was turned over as soon as the note was signed. Q. Then on the day that the note by Mrs. Going to Steward for $85 was made, which was in May? A. Yes, sir; it was in May. Q. Steward gave Armstrong $85? A. Yes, sir; at that time to have restrictions removed. Q. What did Steward do with the note? A. He gave it back to her. Q. When? A. I do not know. Q. Did you see him? A. No, sir. Q. If you and Steward owed her $50 on this deal, why was it that you took her note for the $85 that he paid? A. We took it for expenses till we got her restrictions removed to buy land and let her have this money. Q. You owed her $50? A. Yes, sir. Q. Why did you take a note for what you owed? A. To show we had paid her this much money."

The same line of questions was propounded to the witness Steward when he took the stand, and the answers disclosed the same state of facts as those shown by Wallace. That the trial judge was at a loss to understand how the transaction as detailed by the witnesses constituted a payment of $125 to Zarabelle Going for the tract of land is no discredit to his ability as a judge or his knowledge of the science of computation. The witness was attempting to show that the payment of $25 for a lease and the payment of $50 in money to Zarabelle Going, and then taking from her a note in the sum of $85 by the terms of which she obligated herself to pay Steward $85, was a payment of $125, to Mrs. Going. In other words, Mrs. Going obligated herself to pay Steward $10 more than she received in money for the land and lease, and in addition thereto Wallace and Steward were to receive the land and lease, together with a bonus of $10 paid by the grantor for accepting the same.

We regret that the discovery of this method of liquidating an indebtedness as disclosed by these witnesses is an iridescent dream and vanishes when measured by the cold rule of mathematical calculation. How much easier would it be for an oppressed debtor to satisfy his exacting creditor, if this discovery existed in reality, instead of in the minds of land grafters who are attempting to swindle a ward of this government who is so illiterate that she can scarcely write her own name and so ignorant that she does not know her own age.

That the trial judge has a broad discretion

in propounding questions to a witness during the trial of a cause for the purpose of eliciting the evidence upon and material to a consideration of the issues involved and that it is the duty of the trial judge to exercise this discretion when justice requires it, is the settled law of this state. That this discretion, when exercised, sometimes works to the disadvantage of a witness, whose testimony is transparently false commends itself all the more as a sound and wholesome prerogative to be exercised whenever it is necessary for the ascertainment of truth. De Ford et al. v. Painter, 3 Okla. 80, 41 Pac. 86, 30 L. R. A. 722.

There is nothing in this record from which it appears that the rights of the plaintiff were prejudicially affected by the action of the court in asking the foregoing question, or that any other conclusion could have been reached by the law.

There is only one other question that needs consideration. The admitted facts in this case are that Zarabelle Going was a duly enrolled member of the Choctaw Nation of one-fourth Indian blood: that the appraised value of the land in controversy was $118.79; that the deed under which the plaintiff claims was executed prior to the congressional act of May 27, 1908 (35 Stat. 312, c. 199). This being true, this transaction occurred when the act of Congress of July 1, 1902 (32 Stat. 641, c. 1362), the same being an act to ratify and confirm an agreement with the Choctaw and Chickasaw Tribes, was in full force and effect. Section 16 of said act provides as follows:

"All lands allotted to the members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows: One-fourth in acreage in one year, one-fourth in acreage in three years and the balance in five years; in each case from date of patent: Provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal governments for less than its appraised value."

The finding of the jury and the judgment and decree of the court have established that there was a consideration of only $50 paid for a tract of land of the appraised value of $118.79. The finding of the jury and the judgment of the court are supported by all the evidence and testimony in this record, even that of the plaintiff himself. Hence the plaintiff acquired no right, title or interest in this tract of land by virtue of the deed that he is asserting his claim under in this action.

We therefore recommend that the judgment and decree of the trial court be affirmed.

By the Court: It is so ordered.